# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 18-1750V
### PUBLISHED

MICHAEL CIVATTE,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

Chief Special Master Corcoran

Filed: January 5, 2023

Special Processing Unit (SPU);
Decision Awarding Damages;
Influenza (Flu); Guillain-Barré
syndrome (GBS); Pain and Suffering;
Past Unreimbursable Expenses;
Medical Debt; Incurred; Liable.

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Debra A. Filteau Begley, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On November 13, 2018, Michael Civatte filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he developed Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered on November 11, 2015.  Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

On November 29, 2019, Respondent conceded that Petitioner was entitled to compensation for a Table flu/GBS injury. ECF Nos. 24-25. However, in May 2021, the parties reported an impasse towards the informal resolution of damages and agreed to a briefing schedule. ECF No. 47.[3] Petitioner sought actual and future pain and suffering, as well as substantial unreimbursable medical expenses. Brief (ECF No. 48), citing Ex. 1-20; *see also* Response (ECF No. 51), citing Ex. A; Reply (ECF No. 54), citing (Ex. 21).[4] The initial briefing was completed in August 2021. After I ordered further proceedings centered on the disputed expenses, the parties confirmed that they would rest on their previous briefing and that the matter was ripe for adjudication as of October 2022. ECF No. 77.[5] For the reasons set forth below, I award **$185,075.00** (representing $185,000.00 for actual pain and suffering, and $75.00 for reimbursement of paid expenses) to Petitioner.

## I. Pain and Suffering

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

---

[3] Petitioner temporarily asserted a claim for lost earnings, which Respondent disputed. ECF No. 47. However, upon formally briefing damages, Petitioner discarded this damages component, citing the difficulties of proving losses to his self-owned business. Brief at 11-12; *see also* Reply at n. 2.

[4] The declarations from Petitioner (Exs. 9, 21) and his counsel (ECF No. 69) are not notarized, but they are signed under penalty of perjury. *See* 28 U.S.C. § 1746 (regarding the weight of unsworn declarations if signed under penalty of perjury).

[5] The procedural history centered on the disputed expenses is addressed further, below in section III.

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

**B. Relevant Medical History**

Mr. Civatte was 34 years old when he received the vaccine at issue. He owned and operated a home improvement business. He did not have a primary care provider. He has filed records dating back to September 2012 that establish semi-regular chiropractic treatment for chronic low back pain. The associated diagnostic codes vary throughout the records, but include multiple subluxations, radiculopathy, and tenderness in the lumbar and thoracic regions. *See generally* Exs. 11-12.[7] The chiropractor also treated his chronic bilateral knee pain. On August 26, 2015, Petitioner explained that he had sustained an "old work injury" and he tended to experience greater weakness in his left knee with "certain movements" such as "twisted crawling in attic." Ex. 12 at 20. At further appointments on September 2; October 26; November 3; and November 4, 2015, Petitioner reported pain in the same areas, which was improved with treatment. The chiropractor consistently recorded that his prognosis was "good." Ex. 12 at 21-25.

Petitioner received the subject vaccine at a pharmacy on November 11, 2015. Ex. 1 at 2. Five days later, on November 16, 2015, he returned to his chiropractor for low back and left knee pain. Notably, the chiropractor also observed: "Mike shuffled in. Complaint was couldn't feel his feet." Petitioner's assessment was changed to "guarded and uncertain," and an MRI and "spinal consult" were considered. Ex. 12 at 26-27.

The next day (November 17, 2015), Petitioner presented to the emergency room at New Hanover Regional Medical Center ("NHRMC") in Wilmington, North Carolina, for a three-day history of ascending numbness and weakness in all four extremities, headache, and chronic back pain. Ex. 5 at 2. He could not walk unassisted. *Id.* He had decreased sensation in a stocking-glove pattern, reduced strength in both legs, and reduced triceps strength. *Id.* at 4. Head and spinal MRIs were normal. *Id.* at 4-5. He was admitted with a differential diagnosis including GBS. *Id.* at 5.

On November 18, 2015, Dr. Matthew Kalp conducted the initial neurological evaluation, felt that the most likely diagnosis was GBS, and started a five-day course of IVIg. Ex. 5 at 38-42. Dr. Kalp also recommended physical and occupational therapies and discussed that Petitioner should measure his recovery in weeks to months rather than days." *Id.* at 42.

---

[7] Respondent has asserted that in the late summer and fall of 2015 (leading up to the subject vaccination), Petitioner sought chiropractic care more frequently than before. ECF No. 51 at 2. November 3 and 4, 2015, appear to be the only two consecutive days of treatment in the record. But otherwise, I do not discern a particular pattern in the chiropractic encounters or clear evidence in those records that Petitioner's back and/or knee pain was worsening shortly before the onset of GBS.

On November 19, 2015, a nerve conduction study produced results consistent with GBS. Ex. 5 at 33. That evening, Petitioner developed facial weakness particularly on the right side, numbness in his mouth, difficulty eating, and slurred speech. *Id.* at 26. On November 20, 2015, Dr. Kalp confirmed that these symptoms were a progression of GBS and that no additional treatments were available. *Id.*

On or about November 21, 2015, Petitioner was fitted with a nasogastric tube to be fed and to take gabapentin for pain. His respiratory function remained adequate, but due to concern for rapid deterioration, he was transferred to the intensive care unit ("ICU"). *See* Ex. 5 at 7, 16. After remaining stable in the ICU for 36 hours, he was moved to the "step-down" progressive care unit by the morning of November 23, 2015. *Id.* at 7, 12. Dr. Kalp recorded: "At present he is uninsured and social work is working with him to complete a financial aid application… Additionally, I asked for reevaluation for disability because the recovery 4 pm for [sic; from?] a syndrome can be between 6 and 12 months and patients do not necessarily return to their prior level of functioning." *Id.* at 14.

Petitioner began therapy to improve his mobility, balance, and activities of daily living. Ex. 5 at 7. On November 24, 2015, he was discharged from the main hospital. An internist, Dr. David Girguis, summarized: "Given [Petitioner's] high level of motivation for physical therapy and extensive need for acute rehabilitation stay, he was deemed appropriate for discharge to the acute rehabilitation hospital. He remains with [nasogastric feeding tube] on transfer and swallowing function will need to be periodically assessed by [speech language pathology]." *Id.* at 7. He would continue taking gabapentin, acetaminophen, and ibuprofen for pain. *Id.* at 10.

Upon entering the NHRMC Rehabilitation Hospital[8] on November 24, 2015, Petitioner had reduced balance, coordination, and strength in all four extremities; limited endurance; dysphagia; anxiety; and depression. Ex. 5 at 63-64. He continued with physical, occupational, and speech therapies as well as massage. *Id.* He demonstrated steady but incomplete improvements in strength but still needed modifications or bathing, transfers, and ambulation. *Id.* at 56-57. He became able to ambulate without assistance for increased distances. *Id.* at 58. His pain decreased; he no longer took gabapentin, only over-the-counter NSAIDs. The nasogastric feeding tube was removed, but he continued to have right-sided facial weakness, an inability to fully close his right eye, and tearing.

---

[8] To be considered for admission to the NHRMC Rehabilitation Hospital, a patient must "require 24-hour rehabilitation nursing, daily oversight of the plan of care by a rehabilitation physician, and intense therapy services." *See* https://www.nhrmc.org/locations/nhrmc-rehabilitation-hospital (last accessed December 10, 2022). Petitioner's care was overseen by Dr. John C. Liguori, who is board-certified in physical medicine and rehabilitation by the American Academy of Pain Management. *See* https://www.nhrmc.org/physician-directory/l/liguori-john-c?_cf_chl_managed_tk_=pmd_ymJDFS_El3pIWoCmebWZcPZei3RRxMnZRR8qwGd6uuY-1632504142-0-gqNtZGzNAxCjcnBszQdR (last accessed December 10, 2022).

*Id.* Petitioner's girlfriend received caregiver training and she planned to take some leave from work upon his discharge home on December 18, 2015. *Id.*at 56-64.

On January 4, 2016, upon starting outpatient physical therapy ("PT"), Petitioner reported that he was getting stronger and "trying to work part time doing 'light duty' activities… mainly driving and picking up supplies needed at job sites." Ex. 2 at 7, 52. However, due to weakness and fatigue, he did "not have the strength or stamina to complete job duties including heavy lifting, carrying, ladder climbing." *Id.* at 11. The therapist planned to improve his strength and endurance while avoiding overexertion. Of note, on January 4, 2016, Petitioner's therapy was initially authorized on account of: "NHRMC financial assistance; Medicaid pending," but subsequent records omit the reference to Medicaid. *Id.* at 7.

On January 11, 2016, Petitioner followed up with the internist Dr. Girguis, who recorded that Petitioner's "only residual deficit" was right-sided facial weakness, recorded as: "4/5 with loss of right nasolabial fold; notable weakness of CNVII and very mild paresthesia in right V2." Ex. 5 at 88. But Dr. Girguis also wrote that Petitioner should follow the rehabilitation plan and "not over[do] his therapy at home." *Id.*

Petitioner had three more PT sessions on January 12th, 14th, and 19th, 2016. Ex. 2 at 4-6. During each forty-five (45) minute session, he was able to climb five rungs of a ladder, climb stairs without holding the railing, rise from a kneeling position while holding 35 to 50 pounds, and walk with objects up to 35 pounds in each hand. *Id.* Upon making "excellent progress" and demonstrating "good awareness of limiting the amount of heavy lifting he does," he was formally discharged from PT on January 21, 2016. *Id.* at 12.

On January 19, 2016, Petitioner presented to neurologist Dr. William Boles, who recorded that his facial paralysis persisted on the right side, which diverged from the symmetric recovery typically seen with GBS. Ex. 5 at 146. Dr. Boles also noted his "limited endurance." *Id.*

By his ninth and final outpatient speech therapy session on February 16, 2016, Petitioner still had mild to moderate right-sided facial droop, but his eye was tearing "less" and he had improved range of motion and strength. Ex. 2 at 219-20.

On March 7, 2016, Dr. Girguis recorded that Petitioner had "gone back to work as a painter 'full speed.'" Ex. 5 at 96. As a result of being on his knees without padding for several hours each day, he had developed a left-sided prepatellar effusion. *Id.* at 96-99. With regard to GBS, his right facial weakness "seemed to be improving" and he should "continue getting back to his daily routines slowly and not overdo it at work." *Id.*

On May 12, 2016, Petitioner returned to his chiropractor for the first time since the GBS onset. Ex. 12 at 28. The chiropractor recorded: "Remains from incident… Doesn't feel quite comfortable w balance on ladder." *Id.* Afterwards, Petitioner frequented the chiropractor to address his chronic neck and back pain. *Id.* at 29-52; *see also* Ex. 5 at 117-24 (emergency encounter for severe pain, assessed as intercostal neuralgia).

On February 6, 2017, Dr. Boles recorded that Petitioner was able to work, paint, and "do floors," but he had residual weakness and "was more easily fatigued." Ex. 5 at 102. He could "now work about 8 hours when he previously could work up to 11 or 12 hours doing physical labor." *Id.* at 107. Petitioner's right facial droop was "slightly improved" but still resulted in tearing. *Id.* at 102. Dr. Boles discussed that Petitioner had "not fully recovered at this time" and that "some deficits from GBS may not resolve, but the best course of action is to continue physical activity to work on gradually increasing endurance." *Id.* at 107. Petitioner would continue taking B12 and E vitamins and follow up as needed (although he did not return for over a year, as noted below). *Id.*

On December 14, 2017, Petitioner presented to an orthopedist for a one-month history of left knee pain and swelling. Ex. 13 at 19. The assessment was moderate degree effusion stemming from mechanical-based irritation around the joint, for which Petitioner initially took conservative measures of ice, a neoprene sleeve on his knee, and limiting the amount of time on his feet. *Id.* However, he continued to work on his feet "all day" and regularly squat, climb ladders, and lift supplies. *Id.* at 17-18.

On March 14, 2018, he returned to his orthopedist for continued left knee pain and received an intraarticular steroid injection. Ex. 13 at 17. On March 28, 2018, Petitioner underwent arthroscopic surgery to address several areas of severe chondromalacia[9] and a degenerative tear of the medial meniscus tendon. *Id.* at 21-22. Afterwards, he ambulated with crutches for approximately two months. Ex. 13 at 8-9. In June 2018, he began to perform "light work" at home such as painting on a small step ladder. *Id.* at 7. He received PT until August 6, 2018, *see generally* Ex. 14, then transitioned to a home exercise program due to his lack of insurance. *See* Ex. 13 at 6. About six months after surgery, Petitioner returned to work without restrictions other than trying to avoid climbing ladders. *Id.* at 4. However, he had ongoing left knee pain and new *right* knee pain, attributed to his work duties, that were not alleviated by further steroid injections and continued until at least December 2018. *Id.* at 1-4, 23-24. Orthopedic and primary care records from this time do not reflect any active problems related to GBS. *Id.*; Ex. 3. He

---

[9] Chondromalacia is defined as softening of the articular cartilage, most frequently in the patella. *Dorland's Medical Dictionary Online*, at https://www.dorlandsonline.com (hereinafter "*Dorland's*"). One risk factor is frequent pressure on the knee joints. *See* https://www.healthline.com/health/chondromalacia-patella#diagnosis (last accessed December 10, 2022).

was also diagnosed with sleep apnea, but he was not consistently using the prescribed sleep apnea machine. Ex. 3.

On May 16, 2018, Petitioner returned to Dr. Boles, who carried forward many statements from their previous encounter, including that Petitioner's endurance was "improving with physical therapy" (although his PT for GBS had concluded in 2016). Ex. 5 at 102, 126. Dr. Boles again noted right facial droop with tearing, reduced endurance, but normal strength. *Id.* at 107, 132. Dr. Boles then ordered a nerve conduction study to assess recovery from GBS versus possible CIDP. *Id.* The study showed "significant improvement" and was "essentially normal" except for very mild prolongation of the right-sided peroneal and tibial F wave latencies. *Id.* at 132, 35.

On July 10, 2018, Petitioner presented to a different neurologist at NHRMC, Dr. Alyson Hommel, for a second opinion. Ex. 5 at 138-43. Dr. Hommel recorded the past history and his current complaints of decreased endurance, "mild right-sided facial weakness that he notices after chewing," and "decreased smile little bit on that side or some drooping of his right eye" which was worse with fatigue. The neurological exam was unremarkable except for "minimal R facial weakness" at cranial nerve 7. *Id.* at 141-42. She summarized: "Patient has made a remarkable recovery from his Guillain-Barré given how severely he was affected. He does continue to have some minimal right-sided weakness…" *Id.* at 143. Dr. Hommel's only recommendation was to obtain bloodwork to rule out amyloidosis as an explanation for his facial palsy. *Id.* Petitioner was encouraged to get vaccines against tetanus, while still avoiding flu based on his history. *Id.*

Upon Petitioner's return one year later, on July 10, 2019, Dr. Hommel at NHRMC recorded "no significant neurological change since last visit." Ex. 16 at 3. The record does not address endurance. Dr. Hommel again observed "minimal R facial weakness," characterized as a "synkinesis"[10] at the chin. *Id.* at 6. She carried forward the previous impression and Petitioner would follow up in one year or sooner if needed. *Id.* at 7.

Eighteen (18) months later, on January 8, 2021, Petitioner presented to yet another neurologist, Dr. John Ardeljan at Wilmington Health. Ex. 19 at 1-5. Petitioner relayed his history of GBS. *Id.* at 1. He had residual right-sided weakness, described as "facial asymmetry" on exam. *Id.* Petitioner also reported paresthesias of his feet, which were not corroborated on exam. *Id.* Dr. Ardeljean recommended nerve testing of the lower and possibly upper extremities, which apparently did not take place. *Id.* at 5.

---

[10] Synkinesis is defined as "an unintentional movement accompanying a volitional movement, such as the facial contortions accompanying severe exertion." *Dorland's.*

In his affidavits, Petitioner recalls the startling onset of GBS, including falling in a parking lot and needing assistance from his girlfriend and a stranger. Ex. 9 at ¶ 1. He recalls his hospital admission and receiving the tentative diagnosis of GBS, which he had never heard of before. *Id.* at ¶ 2. Petitioner describes his anxiety and embarrassment upon his further worsening of weakness and severe pain; development of facial paralysis; insertion of the nasogastric tube; admission to the ICU; inability to move his body or communicate; and needing to rely on other people. *Id.* at ¶¶ 2-3; Ex. 21 at ¶¶ 1-3.

Petitioner recalls that after his acute course in November 2015 – January 2016, he still had right-sided facial paralysis with tearing and decreased endurance. Ex. 9 at ¶ 4. He applied for disability benefits but was denied because he had not been out of work for over a year. Ex. 21 at ¶ 4. He did not want to become completely destitute. *Id.* He resumed his home improvement business, but "could barely see out of [his] right eye" while operating power tools. Ex. 9 at ¶ 6; Ex. 21 at ¶ 4. He had two employees trying to cover for him and complete the projects he already had, and he was not able to bring in new work. Ex. 9 at ¶ 2. "A little over a year later," in 2017, he shuttered his business and became a subcontractor. *Id.*; Ex. 21 at ¶ 4.[11] Petitioner asserts that he still has reduced endurance due to GBS up to 2021, but does not factor in his unrelated neck, back, and knee pain. Petitioner also details that his facial paralysis, in addition to affecting his work, also affects his vision, eating, and drinking; is a continuing reminder of his acute injury; and hurts his self-esteem. Ex. 9 at ¶¶ 4, 7.

Petitioner avers that his outstanding medical debt of over $90,000.00, stemming from his uninsured treatment for GBS in 2015 - 2016, is "insurmountable." Ex. 21 at ¶ 5. As of September 2021, he is still "constantly bombarded" with letters and calls from debt collectors. *Id.* The debt has "completely destroy[ed]" his credit score. *Id.*

Petitioner recalls that his then-girlfriend had spent "every moment she could" with him during the hospitalization in late 2015. Ex. 9 at ¶ 7. They subsequently married. Due to his medical debt, his wife assumed title of his work vehicle and made joint purchases on a credit card in her own name. Ex. 21 at ¶ 6. Upon their divorce, he had limited credit to find a new home. *Id.* His poor credit score also limits his ability to fund construction projects and to provide for himself after an anticipated back surgery. *Id.* at ¶¶ 7, 10.

---

[11] Petitioner asserts that for his line of work, he should maintain his immunity against tetanus, but he has "a potential risk with the tetanus shot because it is similar to the flu shot, which I am now classified as allergic too… I have not had a clear consensus with doctors I have spoken to about whether or not it is safe for me to receive." Ex. 9 at ¶ 6. The medical records reflect Petitioner's concern about tetanus vaccine, but no doctor's opinion that it was contraindicated. *See, e.g.*, Ex. 5 at 139-43; Ex. 15 at 9-10; Ex. 16 at 1-7.

## C. Analysis and Conclusion Regarding Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that impacted his awareness. Therefore, I analyze principally the severity and duration of his injury.

In requesting $185,000.00 for past pain and suffering, Mr. Civatte emphasized his seven-day hospitalization, including treatment with IVIg, insertion of a feeding tube, and temporary transfer to the ICU due to concern for rapid respiratory deterioration and his subsequent twenty-four (24) days at a rehabilitation hospital. He experienced right-sided facial paralysis and decreased endurance which impeded his activities of daily living, personal relationships, and occupation. He averred that his case "must be considered more devastating than the course of treatment" in several past cases. Brief at 14-15 (citing *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 504012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for past pain and suffering); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) ($170,000.00); *see also* Reply at 14 (citing *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-835V, 2020 WL 2666685 (Fed. Cl. Spec. Mstr. March 11, 2021) ($160,000.00). Petitioner also recognized my oft-stated view that GBS pain and suffering awards generally should be higher than those received by petitioners who have suffered a less frightening and physically alarming injuries such as SIRVA. Reply at 14.

Petitioner further maintained that the residual effects of his bout of GBS have persisted for over five years, with "no end in sight," which thereby justifies a further award of $1,500.00 per year for future pain and suffering. Brief at 10-11. In support of this request, he noted that $1,000.00 per year was awarded to another petitioner who, after sustaining a SIRVA, continued to have occasional pain when her arm was in certain positions that was moderate at worst and did not significant impact her desk job. Brief at 16 (citing *Binette v. Sec'y of Health & Hum. Servs.*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. July 8, 2019).

Respondent countered that the record only supports $125,000.00 for past pain and suffering, because (Respondent averred) Petitioner's initial course in the hospital and inpatient rehabilitation was "fairly typical of a less severe case of GBS," followed by "dramatic" improvement in strength and a return to work. Response at 9-10. Petitioner's facial paralysis was "mild" upon discharge and continued to improve. *Id.* 10-11. After March 2016, there was "no evidence" of residual symptoms in Petitioner's arms and legs. *Id.* at 10. Respondent averred that while the medical records note "some degree" of reduced endurance and fatigue, those symptoms were not necessarily attributable to GBS, in light of his additional diagnoses including sleep apnea and retrognathia. *Id.* at 10

and n.10. Respondent also averred that Petitioner also continued to work until 2018, when he had worsening knee pain and underwent surgery. *Id.* at 11.

Based on the above, Respondent contended that Mr. Civatte's GBS course was "far less severe" than what was suffered by the allegedly comparable petitioners in *Johnson* and *Dillenbeck*. Response at 11-12. Instead, Mr. Civatte's injury was comparable to other injuries that were "resolved" for at or near $125,000.00. *Id.* at 12.[12] But Respondent did not identify any of those apparently comparable cases, citing the Vaccine Act's privacy provisions as rationale for why they cannot be disclosed. However, given that no *reasoned opinion* had awarded such a low figure for pain and suffering for GBS at the time of Respondent's briefing (in August 2021), Respondent was clearly referring to cases resolved by litigative risk settlement, as well as those where he conceded entitlement but persuaded Petitioner to accept his assessment of damages (as set forth in a Proffer). I have repeatedly stated that these cases, while helpful to prompt resolution and preservation of judicial resources, are far less persuasive (or useful for the purposes of guiding a damages determination) than reasoned Vaccine Act decisions.

The record establishes that Mr. Civatte developed GBS, which is a significant injury. It manifested with alarming numbness, weakness, and pain, rendering him unable to care for himself. He received a diagnosis which he, like many other patients, had never heard of, and was thereafter hospitalized for seven days and received one course of IVIg. He then received twenty-four (24) days of in-patient physical, occupational, and speech therapies[13] followed by a limited outpatient course. I also recognize the rather unusual involvement of facial paralysis which initially necessitated a feeding tube and improved slowly. The medical records support his assertion of right eye weakness and tearing until at least May 2018, which would have made it less safe to perform his job. He continued to recover, with "minimal" facial asymmetry approximately six years into the course. Finally, Petitioner was uninsured and incurred significant medical debt, which has caused anxiety, marital difficulties (culminating in divorce), worsened credit, and continued

---

[12] I have awarded close to Respondent's proposed figure in conceded flu/GBS cases. *See, e.g.*, *Sand v. Sec'y of Health & Hum. Servs.*, No. 19-1104V, 2021 WL 4704665 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $130,000.00 for actual pain and suffering). However, Mr. Sand's case is distinguishable as it was "on the mild end of the spectrum," not involving hospitalization, immunosuppressant treatments, or compelling long-term impacts on his life. Moreover, that opinion could not have informed Respondent's brief in Mr. Civatte's case, which was filed eleven (11) days earlier.

[13] The parties debated whether Petitioner's inpatient rehabilitation stay counted towards his overall "hospitalization." Response at n. 7; Reply at n. 1. I find that Petitioner had stabilized without concern for respiratory or autonomic failure after seven days, but his doctors found that further hospitalization was warranted due to his facial paralysis and reliance on a feeding tube, as well as for intensive therapy.

communications from debt collectors. Indeed – the mental and psychological burden of his medical debt is in some respects the most significant residual effect at this point.

On the other hand, while Mr. Civatte found his transfer to the ICU to be alarming, that transfer was in case of rapid respiratory deterioration, which did not occur, and he was released from the ICU within two days. His pain decreased and his strength improved dramatically during inpatient rehab. While numerous doctors gave credence to Petitioner's GBS reducing his endurance at work, and he contended that was the reason he shuttered his business and became a contractor in 2017, the medical records also reflect chronic and worsening knee pain which prompted surgery in March 2018, a six-month restriction from work, and subsequent steroid injections. In more recent years, his chronic back pain has worsened and will apparently require surgery.[14] It is therefore difficult to attribute his ongoing work restrictions to GBS.

The severity and duration of Mr. Civatte's pain and suffering from GBS is, in many important respects, mild. Respondent correctly noted that *Johnson* involved a longer course of physical therapy, decreased sensation including of excretory functions, and persistent fatigue that was more clearly attributable to GBS.[15] In *Dillenbeck*, for five to six months after discharge, the petitioner needed significant assistance from family members, used a walker to ambulate, and took prescription pain medications. *Dillenbeck* is, however, otherwise comparable in the sense that the petitioner returned to work due to financial constraints, despite an incomplete recovery from GBS. A more comparable case is *Francesco v. Sec'y of Health & Hum. Servs.*, No. 18-1622V, 2020 WL 6705564 (Fed. Cl. Spec. Mstr. Oct. 15, 2020) (awarding $165,000.00). Mr. Francesco underwent a similar hospitalization (eight days), one course of IVIg, and inpatient rehabilitation stay (22 days); made a good recovery; and returned to his job as an engineer in short order. *Id.* at *3-4.

However, Mr. Civatte's persistent facial paralysis and the financial and personal strain stemming from his uninsured treatment are countervailing considerations that are also entitled to some weight. I thus find it appropriate to award **$185,000.00** for past pain and suffering. But based on the available record (and my determination that the medical debt is less likely to be an ongoing concern, as set forth below), I decline to make a further award for future pain and suffering.

---

[14] However, I agree with Petitioner that any link between his decreased endurance and fatigue and his sleep difficulties is less obvious. Reply at 4.

[15] Respondent incorrectly states that Ms. Johnson was "completely unable to return to driving or perform any work for at least 8 months." Response at 11. She actually "began to drive cautiously" and returned to half-day shifts as a school librarian three months after onset, in March 2016, then returned to her additional role as a bus driver the following school year. 2018 WL 5024012, at *3-4.

## II.  Unreimbursable Expenses

### A. Legal Authority

The Vaccine Act permits a special master to award claimed expenses which:

(i)     "resulted from the vaccine-related injury for which the petitioner seeks compensation;

(ii)    were incurred by or on behalf of the person who suffered such injury; and

(iii)   were for diagnosis, medical or other remedial care… determined to be reasonably necessary."

Section 15(a)(1)(B).

It is undisputed that claimed medical expenses are generally eligible for payment (in the context of a successful claim – as here), under Vaccine Act Sections 15(a)(1)(B)(i), (iii). However, such expenses must be "incurred" under Section 15(a)(1)(B)(ii). While "incurred" is not defined in the Vaccine Act, it is properly construed based on its ordinary meaning: "to 'incur' expenses means to pay or become liable for them." *Black v. Sec'y of Health & Hum. Servs.*, 93 F.3d 781, 785 (Fed. Cir. 1996). "In one common usage, a person becomes liable for yet-to-arise expenses at the time of undertaking an obligation to pay those expenses if and when they arise." *McCulloch v. Sec'y of Health & Hum. Servs.*, 923 F.3d 988, 1003 (Fed. Cir. 2019) (citing *Black's Law Dictionary* (10th ed. 2014) (defining liability as the state "of being legally obligated or accountable"). The expenses must also be "unreimbursable." *See* Section 15(g) (enumerating five specific offsets from a Vaccine Program award).

### B. Background Relevant to Unreimbursable Expenses Inquiry

As noted above, November 2015 marked Petitioner's onset of GBS and admission to NHRMC. Petitioner was noted to be uninsured, and therefore NHRMC social work staff began working with him to complete a "financial aid application." Ex. 5 at 14.[16] He was deemed ineligible for Medicaid in January 2016, and the subsequent medical records continued to reference "NHRMC financial assistance." Ex. 2 at 7, 15. NHRMC applied "charity care adjustments" to certain outstanding balances which were still reflected on billing statements printed in March 2019. *See generally* Ex. A; *see also* Ex. B at 4, 6. But

---

[16] Petitioner stated that he was uninsured because he was "self-employed as a contractor" upon the GBS onset in November 2015. Ex. 21 at ¶ 5. The NHRMC medical records corroborate that Petitioner was uninsured until he was added to his then-wife's health insurance policy in January 2018. Ex. 5 at 1.

also in March 2019, Petitioner declared that he still had "over $90,000.00… in medical bills," which he would "never be able to pay off this debt, it will follow [him] from the rest of [his] life." Ex. 9 at ¶ 2. In January 2020, Petitioner supplemented his demand to account for these "substantial" expenses. ECF No. 27; *see also* Ex. 20 (billing statements printed in 2020).[17]

The parties attempted to resolve this damages component, but they reached an impasse in May 2021, and agreed to a briefing schedule (with their respective arguments addressed below). ECF Nos. 36-47. After reviewing their briefs, I ordered Petitioner to obtain, from each creditor, an updated statement confirming the current/purported outstanding balance(s). ECF No. 55 at 2; Ex. 22-25. I also ordered Petitioner to pursue, from NHRMC, written confirmation of his eligibility for any financial assistance, as well as explanation of the discrepancies between the previously filed billing statements. ECF Nos. 55, 67. However, NHRMC did not respond to repeated inquiries, including a subpoena served by Petitioner, for the latter request. ECF No. 58. But Petitioner's counsel personally reported, under penalty of perjury, NHRMC's verbal confirmation that the balances reflected in Ex. 25 were correct and final. ECF Nos. 68-69. After further efforts, Petitioner's counsel obtained a letter from NHRMC describing its financial assistance policies, but not how they were applied in his case. Ex. 26.

In August 2022, a status conference was convened at Petitioner's request. ECF Nos. 71-72. The parties agreed that Respondent would take the lead in preparing and serving a subpoena for NHRMC, in one final effort to clarify his eligibility for financial assistance and the disposition of his medical expenses. ECF No. 72 at 2. However, NHRMC again failed to respond. ECF Nos 73-75. Thus, in October 2022, the parties jointly reported that it was "clear… that no additional information will be forthcoming from NHRMC." ECF No. 77 at 2.

Petitioner finally reiterated his request for payment of all outstanding medical debts reflected in Ex. 20 (*see also* Exs. 22-26). Respondent "[stood] on the objections detailed in his briefing." ECF No. 77 at 2-3 (citing Exs. A-B). Petitioner requested that any payments permitted be made out to him, except for the balance(s) owed to NHRMC, which could be paid directly to that entity. ECF No. 77 at 2. Respondent stated that any payments allowed should be made jointly to Petitioner and the billing provider. *Id.* The parties otherwise agreed that no further briefing was necessary; "the record should be closed and that the matter [was] ripe for adjudication." ECF No. 77 at 3.

---

[17] Petitioner originally filed these 27 pages in June 2020 as Ex. 18, and again in March 2021 as Ex. 20. From my review, the exhibits are identical. The latter is cited consistently in the parties' briefing and status reports, and thus, in this decision as well.

## C. Parties' Arguments

In his June 2021 brief, Petitioner averred that he was "uninsured throughout most of his treatments, requiring that nearly all of his expenses be paid out of his own pocket." Brief at 8 and n. 1. He "ha[d] incurred over $90,000.00 in unreimbursed medical bills." *Id.* at 12 (citing Ex. 9 – affidavit). He therefore requested "payment of [these] past unreimbursed expenses." *Id.* at 16.

In reaction, Respondent acknowledged that all of the claimed expenses were for "medical care related to Petitioner's vaccine injury," and thus normally would be compensable under the Vaccine Act. Response at 13-14. Respondent therefore agreed that the Petitioner should be compensated for actual documented payments made for medical care. *Id.* at 14. But Respondent opposed expenses that Petitioner unquestionably *had not paid* (and which the medical record established that Petitioner had "incurred" between November 17, 2015, and February 16, 2016). *Id.* at 14.[18] Respondent also raised concern that the largest creditor, NHRMC, had initially written off and then reasserted certain balances. *Id.* at 14-15 (comparing Ex. A to Ex. 20 at 5, 7,8). And he argued that the state law three-year statute of limitations to obtain these repayments had expired, but there was no evidence that any creditor had secured a judgment for the outstanding debts -meaning Petitioner was no longer liable for them. *Id.* at 14 (internal citations omitted). Overall, Respondent contended that "providing payment to Petitioner for [the unpaid expenses] would result in a windfall recovery that is not intended or permitted by the Act." Response at 15.[19]

On reply, Petitioner asserted that Vaccine Act Section 15(g) does not recognize an expired statute of limitations as an offset to an award. Reply at 13; *see also id.* at 10 (noting that the debts have not been "paid by a third party, forgiven, or discharged in bankruptcy"). Therefore, the medical debts were "unreimbursable." Further, the debts did not become "unincurred" solely as a result of the passage of time. *Id.* at 12-13 (internal citations omitted). So even if Respondent's interpretation of the limitations period were accepted, the debts continue to exist and negatively impact his life. *Id.* at 13-14.

---

[18] "The vast majority of the bills were *incurred* in 2015…" Response at 14 (emphasis added).

[19] Respondent also averred that he had attempted to discuss legal issues concerning the expenses with Petitioner's counsel several times from July 2020 – August 2021, but Petitioner had not provided a legal response. Response at 13. Thus, Respondent "reserved the right to reply" to any legal reasoning offered by Petitioner. *Id.* Petitioner subsequently objected to any additional briefing – adding that if additional briefing were permitted, Petitioner should be afforded "the last word." Reply at n. 10. But in their final filing, the parties jointly agreed that the expenses had been adequately briefed and that the record should be closed. ECF No. 77 at 3.

### D. Analysis

### *NHRMC*

The majority of claimed expenses relate to Petitioner's treatment at NHRMC and related entities in 2015 - 2016. It is undisputed that his Medicaid disability application was denied – eliminating that potential avenue for satisfaction of the NHRMC expenses (although under the Act, any Medicaid coverage granted would give rise to a lien that would allow reimbursement of it). The subsequent medical care authorization referenced at least the potential of "NHRMC financial assistance" – but that was not confirmed, and "if and when" such potential assistance was decided, it seems more likely than not that Petitioner would be liable for any remaining balance. *McCulloch*, 923 F.3d at 1003.

However, it is evident from the record that NHRMC applied its charity care policy to "write off" outstanding balances of $5,821.65 and $117.94. Ex. B at 4, 6 (billing statements printed in March 2019). These two balances were not claimed by Petitioner, and they do not appear on any other billing statements. Thus, they are not reimbursable.

In addition, the record establishes that NHRMC applied its charity care policy to "write off" certain additional balances ($533.92, $2,629.18, and $123.96) in early 2016, maintaining that accounting until at least March 2019. *See generally* Ex. A, also at Ex. B at 1-3, 5.[20] Petitioner later obtained from NHRMC updated billing statements reflecting that those same balances were *outstanding* – without any "charity care" or "self-pay" discount for those specific expenses. *See* Ex. 20 at 5-8 (printed May 2020); *accord* Ex. 25 36-39 (printed November 2021). Petitioner has supplied insufficient explanation for the discrepancies between the statements. Accordingly, I will not permit recovery of these sums and medical expenses either, since the available evidence preponderantly establishes they were voluntarily borne by NHRMC.

Petitioner also requested reimbursement of approximately $1,500.00 to an NHRMC-affiliated physicians' group. Ex. 20 at 10-11. While reflecting GBS-related medical expenses arising in 2015-16, the submitted statement is not dated and does not contain any due date for payment. *Id.* Petitioner has otherwise not succeeded in obtaining an updated statement. ECF No. 66. These expenses are not reflected elsewhere, e.g., within Ex. 18 at 2-3 (the debt collection total) or Ex. 25 (the updated statement from NHRMC). Thus, the expenses may have been written off, discounted, or no longer pursued - but cannot be reimbursed herein.

---

[20] There is also no evidence that NHRMC turned these specific balances over to a debt collector.

There are at the same time, however, medical expenses that it appears NHRMC did not voluntarily waive or write off. Petitioner initially submitted a brief non-itemized statement from Paragon Revenue Group (identified as a debt collector working on behalf of NHRMC) which lists debts of $53,181.30 and $32,110.71, respectively – for a total of $85,292.01. Ex. 20 at 3-4.[21]

Petitioner has now filed itemized billing statements which reflect the exact same outstanding balances, after application of a 50% discount on account of Petitioner's "self-pay uninsured" status. *See* Ex. 25 at 1-35 (printed November 2021). Based on the available evidence, there is no indication that NHRMC ever applied a charity care discount (or reversed any such determination years later) to these balances (as opposed to those discussed previously). Instead, NHRMC initially applied, and has maintained, the 50% self-pay discount to these expenses. *See* ECF Nos. 68-69.[22] After applying the discount, NHRMC then turned the outstanding balances over to its debt collector Paragon, which has continued to pursue payment. *See* Ex. 21 at ¶¶ 5-6 (Petitioner's attestations of continued "bombard[ment]" by debt collectors).

I find that Petitioner has provided sufficient documentation that NHRMC and its agent Paragon have asserted these expenses since they initially arose in 2015 – 2016. A secondary issue, however, is whether the expenses represent ongoing liabilities to Petitioner that *can* be relieved under the Vaccine Act.

Respondent emphasized that Petitioner received care and lives in North Carolina, where the applicable statute of limitations to file an action "upon a contract, obligation, or liability arising out of a contract, express or implied" is three years. Response at 14, citing N.C. Gen. Stat. § 1.52(1). With regard to when the limitations period runs, Respondent argued:

> "The vast majority of the bills were incurred in 2015, and the two largest bills from NHRMC covered care through December 18, 2015. *See* Ex. 20 at 2. Thus, the statute of limitations appears to have expired, at best, in late 2018. The most recent bill submitted was from February 16, 2019, so the statute of limitations for those bills appears to have expired in early 2019. There is also no evidence any of Petitioner's providers secured a judgment for these

---

[21] The Paragon Revenue Group statement lists an additional debt of $250.00 originating in 2019. Ex. 20 at 4. Petitioner has not claimed this expense, and it is not included in my analysis or calculations of the expenses to be awarded.

[22] This is consistent with NHRMC's verbal representation to Petitioner's counsel (although such indirect witness statements have a high hearsay quality that makes it difficult to give them much evidentiary weight, no matter how sincere counsel may be in reporting them).

bills, so given the expired statute of limitations, it does not appear that Petitioner is [currently] liable for these expenses, and therefore, they are not 'incurred' under the [Vaccine] Act."

Response at 14.

Neither party cited caselaw interpreting the above-cited statute of limitations. My own research confirmed that it does cover a medical provider's rights to collect on outstanding debt. *Johnson Neurological Clinic v. Kirkman*, 121 N.C. App. 326 (1996).

In the cited case, an individual established care with a medical provider for treatment of injuries sustained in an automobile collision. *Id.* at 328. The individual's health insurance carrier covered some initial costs – but not those for a surgery and follow-up treatment. *Id.* After the individual obtained a settlement from another party involved in the automobile collision, the clinic began requesting that he repay his unpaid balance. *Id.* at 329. The North Carolina Court of Appeals[23] thus addressed, as a matter of first impression, "when a cause of action begins to run for collection of payment for medical services provided." 121 N.C. App. 326, 330. The court held that "absent a contract stipulating the date when payment is due, a cause of action for collection of payment for continuing medical treatment arises at the time the last treatment is provided." *Id.* at 331.

Here as previously stated, NHRMC initially authorized Mr. Civatte's medical care while referencing at least the potential of unspecified financial assistance policies. Despite both parties' best efforts, NHRMC has not explained when or how those policies were adjudicated – or, pending their outcome, when NHRMC would require Petitioner to pay the remainder of the balance(s). At some point after determining that Petitioner was entitled to only a 50% self-pay discount, NHRMC engaged its debt collector Paragon, who stated that payment was due by August 25, 2019. Ex. 20 at 4 (billing statement dated April 6, 2020). But it is far from clear that the debt collector's correspondence reflects any agreement between the provider who rendered the medical services and the indebted individual. Instead, like in *Johnson Neurological Clinic*, the available evidence does not include a "contract stipulating the date when payment is due." 121 N.C. App. 326, 331.

---

[23] The North Carolina Court of Appeals hears the majority of appeals from the state's trial courts. Its holdings are controlling questions of state law, absent a conflicting opinion from the state's Supreme Court (which does not exist in this instance). State of North Carolina, *Your Government - Judicial Branch*, https://www.nc.gov/your-government/judicial (last accessed December 10, 2022).

Thus, calculating when the statute of limitations cut-off arrived depends on the relevant dates of treatment. As Respondent correctly noted, NHRMC is pursuing payment for services rendered from November 2015 through February 16, 2016. Ex. 25 at 10, 35, 36, 38, 39. That end date represents the most likely start of the limitations period for pursuing those expenses – meaning the three-year period to pursue a claim for the medical expense liabilities terminated in February 2019 without action, as Respondent contends, and those sums are not reimbursable herein.

In so finding, I recognize that Petitioner followed up at NHRMC for his GBS and residual effects until approximately 2019. Ex. 16 at 3-7. However, it does not appear that he continued to personally incur additional expenses owed to NHRMC throughout that time. Rather, the available evidence indicates that he secured health insurance coverage by at least January 1, 2018. *Id.* at 1. Moreover, Petitioner subsequently established care with a neurologist outside of NHRMC. Ex. 19 at 1-5 (January 2021 – Dr. Ardeljan). That explains the limited scope of Petitioner's asserted debt to NHRMC – and that the statute of limitations thereof has expired. I also emphasize the lack of evidence that NHRMC has (to date) pursued any judgment against Petitioner for the outstanding balance. *See* Response at 14.

### Additional Creditors

There is no evidence or allegation that the remaining creditors – Coastal Rehabilitation; Delaney Radiologists; and Solstas Lab Partners – ever considered granting any form of financial assistance to Petitioner. Thus, he is presumed – at least initially – liable for those expenses. But like NHRMC, these creditors' balances all stem from medical expenses incurred in late 2015 – early 2016, and there is insufficient evidence of a continuous course of medical treatment. *See generally* Exs. 20, 22-23. Additionally with respect to the expenses from Solstas Labs, that entity has been acquired by another entity, Quest Diagnostics. ECF No. 60. Quest Diagnostics has not produced updated billing records relating to Petitioner or other evidence that it is continuing to pursue these expenses. Ex. 24. Therefore, I find that there is insufficient evidence that Petitioner remains liable for them, and they will not be awarded.

### Remaining Arguments

Petitioner argued that "the Vaccine Act does not incorporate state law standards." Reply at 11. But to establish this point, he relied upon a Court of Federal Claims decision specifically disclaiming the application of state law standards (pertaining to the acceptance of testimony about medical possibility versus probability) to a petitioner's burden to establish *entitlement* under the Vaccine Act. *Id.* (citing *Van Epps v. Sec'y of*

19

*Health & Hum. Servs.*, 26 Cl. Ct. 650, 653 (1992)). This is neither binding nor particularly persuasive in addressing Petitioner's burden to establish his liability for asserted damages, since the question of that liability implicates state law provisions for its collection. And in any event, it is not disputed that *under the Vaccine Act* these would be unreimbursable expenses *if* they were otherwise properly, and legally, charged against him. The latter question can in this case only be answered by consideration of law outside the Act itself.

Petitioner also maintains that even if the limitations period has expired, the debts still exist. He needs to respond to any lawsuit that is filed (however untimely) to avoid the risk of default judgment. Reply at 14-15. However, Petitioner's citation to a "self-help" website explaining how to respond to such potential suits[24] suggests that the burden is not so significant. It bears emphasizing that Petitioner has not demonstrated any such legal action to date.

Petitioner also cited *Whitley's Electric Service, Inc. v. Sherrod*, 293 N.C. 498, 505 (1977), which held that after expiration of a limitations period, "a payment" can revive an old debt. Reply at 15. Petitioner reasoned that by extension, "his submission of his past expenses and his request for reimbursement of them by the Program… constitutes acknowledgment of the existence of his previously time-barred debts, and demonstrates Petitioner's willingness, or at least his obligation, to pay of the balanced owed via his Vaccine Program award." Reply at 15;[25] *but see* Ex. 21 at ¶ 5 (asserting that he lacks other means to repay the debt and it is "insurmountable"). But after *Whitley's Electric Service,* the North Carolina Court of Appeals has held that such "conditional" statements pertaining to use of a hoped-for legal award are insufficient to revive an otherwise-expired debt. *Johnson Neurological Clinic*, 121 N.C. App. at 331 (citing *American Multimedia, Inc. v. Freedom Distributing, Inc.*, 95 N.C. App. 750, 752 (1989), *review denied*, 326 N.C. App. (1990) (holding that to toll the statute of limitations, the indebted party "must manifest a definite and unqualified intention to pay").

Petitioner also asserted that the debts are still listed in his credit history, and he is still contacted by debt collectors (which is corroborated at least with respect to NHRMC). Ex. 21. No doubt this has been a burden (and one I have tried to take into account in fashioning a fair pain and suffering award). But under the Fair Credit Reporting Act, a

---

[24] Citing SoloSuit, *North Carolina Statute of Limitations on Debt*, Oct. 26, 2022, available at https://www.solosuit.com/posts/north-carolina-statute-of-limitations-debt (last accessed January 4, 2023) ("hereinafter "SoloSuit").

[25] Citing Federal Trade Commission, *Debt Collection FAQs*, available at https://consumer.ftc.gov/articles/debt-collection-faqs#debts (last accessed January 4, 2023) (providing that even a promise to pay can revive a debt "in "some states").

debt generally can appear on one's credit report for a maximum of *seven* years, regardless of when satisfied. 15 U.S.C. § 1681c(a)(4).[26] Without at all excusing the parties' protracted dispute over these expenses, I observe that the expenses were incurred in late 2015 – early 2016. And it is possible Petitioner could independently pursue their removal from his credit report. Their continued inclusion, however, is not a basis *per se* for awarding costs that Petitioner is not obligated personally to pay.

### CONCLUSION

**Based on the record as a whole and the foregoing, I award a lump sum of <u>$185,075.00</u> (representing $185,000.00 for actual pain and suffering,[27] and $75.00 for reimbursement of paid expenses[28]) in the form of a check payable to Petitioner.**

---

[26] *Referenced in* the SoloSuit article at *supra* note 24 – citing Consumer Financial Protection Bureau, *My Debt is Several Years Old. Can Debt Collectors Still Collect?*, available at https://www.consumerfinance.gov/ask-cfpb/my-debt-is-several-years-old-can-debt-collectors-still-collect-en-1423/#:~:text=Under%20the%20Fair%20Credit%20Reporting,few%20cases%2C%20longer%20than%20that. (last accessed January 4, 2023).

[27] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[28] Respondent agreed that Petitioner should be reimbursed for the expenses actually paid but calculated that total as $80.00. Response at 14. From my review, the total is $75.00. *See* Ex. 20 at 5, 7, 8; *accord* Ex. 25 at 36, 38-39.

This amount represents compensation for all damages that would be available under Section 15(a).[29] The Clerk of the Court is directed to enter judgment in accordance with this Decision.[30]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[29] It is noted that in response to a letter from NHRMC financial services, a status conference was held at Petitioner's request in August 2022. *See* Ex. 26; ECF Nos. 71-72. Upon consideration of the entire record, I hereby confirm that NHRMC (or, for that matter, any other creditor) may not pursue further reimbursement from Petitioner based on the damages award in this case. ECF No. 72 at 1. As previously explained:

> [U]nder the Vaccine Act, the Program is the payor of 'last resort,' and may only award qualifying unreimbursed expenses. Here, NHRMC has already discounted Petitioner's expenses – effectively paying itself for half of them as a charitable act. As a result, any potential future attempt by NHRMC would not be authorized by the Act's plain language and its general prohibition against third-party subrogation.

ECF No. 72 at 1-2, citing the General Order Regarding Subrogation, available at https://www.uscfc.uscourts.gov/vaccine-guidelines (last accessed December 23, 2022).

[30] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.